

FILED
Apr 07 2015, 9:57 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Mark Leeman
Logansport, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Glenn Sciaraffa,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | April 7, 2015<br><br>Court of Appeals Cause No.<br>09A04-1410-CR-470<br><br>Appeal from the Cass Superior Court.<br><br>The Honorable Richard A.<br>Maughmer, Judge.<br><br>Cause No. 09D02-1405-FB-24 |

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Glenn Sciaraffa (Sciaraffa), appeals his conviction for dealing in methamphetamine, a Class B felony, Ind. Code § 35-48-4-1.1(a)(1) (2013); maintaining a common nuisance, a Class D felony, I.C. § 35-48-4-13(b)(1) (2013); possession of paraphernalia, a Class A misdemeanor, I.C. § 35-48-4-8.3 (2013); and his adjudication as an habitual substance offender, I.C. § 35-50-2-10.[1]

We affirm.

## ISSUES

Sciaraffa raises three issues on appeal, which we restate as follows:

(1)    Whether the trial court committed a fundamental error by admitting the presumptive positive test for methamphetamine;

(2)    Whether fundamental error occurred during the State's closing argument; and

(3)    Whether the State presented sufficient evidence beyond a reasonable doubt to sustain Sciaraffa's conviction.

## FACTS AND PROCEDURAL HISTORY

---

[1] This statute was repealed by P.L.158-2013, § 664, eff. July 1, 2014.

[4] During the evening of May 1, 2014, and into the early morning hours of May 2, 2014, Sciaraffa manufactured methamphetamine in his residence near Galveston in Cass County, Indiana. He resided in the residence with his girlfriend Brandi Bragg (Bragg) and Bragg's fifteen-year-old son. Sciaraffa manufactured the methamphetamine using the one-pot or "shake and bake" method in a closet in his house, which he had outfitted with a trap door and a fan to release the chemical fumes as he "burped" the gas from the mixture. (Transcript pp. 131, 126). At one point during the evening, Sciaraffa and Bragg tested the methamphetamine by smoking a small portion Sciaraffa had extracted from the chemical solution. Bragg went to bed around 1 a.m. on the morning of May 2, 2014, while Sciaraffa continued the manufacturing process.

[5] Bragg awoke around 11 a.m. that same morning and followed Sciaraffa out to the garage. She "wanted to catch a buzz" and smoke some of the methamphetamine Sciaraffa had manufactured during the night. (Tr. p. 118). They both smoked the methamphetamine from a pipe in the garage and Sciaraffa handed Bragg a small amount in a bag to consume later. Sciaraffa then instructed Bragg "to clean house because he felt [] probation was going to be there today." (Tr. p. 118).

[6] Around 4:30 p.m. that afternoon, as Bragg was knocking on the garage door, several law enforcement officers arrived at the residence. Bragg informed the officers that Sciaraffa was in the garage and would not come out. When Howard County Probation Officer Dustin DeLong (Officer DeLong) approached the garage, Sciaraffa opened the door. Officer DeLong

immediately "noticed a very strong odor emitting from the garage," which took his breath away. (Tr. p. 25). Asked what he was doing, Sciaraffa "held up a paint can," "pointed to a guitar," and informed the officer that he had been painting the instrument. (Tr. p. 25). Because the odor was not a paint smell but rather a "chemical type smell" that the officer could not really describe, Officer DeLong did not believe Sciaraffa's explanation. (Tr. p. 26).

[7] Officer DeLong informed Sciaraffa of the home visit; Sciaraffa agreed to a drug screen, and consented to a search of the residence. When giving his urine sample, Sciaraffa admitted that he had used methamphetamine within "the last three days." (Tr. p. 28). He did not appear to be under the influence at that time and was "very cooperative." (Tr. p. 36). During the search of the cluttered residence, the officers located a pipe in the master bedroom; a pen tube with a burned end and white residue on the kitchen counter; a blue surgical glove containing lithium battery casings on a kitchen ceiling beam; a bottle of acetone in the freezer; a glass pipe on a table on the back porch; a glass bottle with a milky, oily substance in the middle room off the back porch; a red Igloo container with liquid; an empty Coleman fuel can and a white container annotated with "Fridge and Air Coil Cleaner" hidden behind a table in the back closet; and a Gatorade bottle with liquid on top of a cabinet. (State's Exh. 16). In the garage, the officers located clear air hose tubing used in the gassing process and digital scales. All of these items are associated with the manufacture of methamphetamine.

[8] Samples were taken from the liquid inside the Gatorade bottle and from the oily, milky residue in the glass bottle and analyzed by Indiana State Police forensic scientist Kim Burrow (Scientist Burrow). During her analysis, Scientist Burrow did not find any presence of a controlled substance in the Gatorade bottle, but concluded that the glass bottle presumptively "indicated the presence of [m]ethamphetamine." (State's Exh. 28). She had an insufficient sample detail to run a confirmatory test, and noted on her certificate of analysis that "the concentration was insufficient for complete identification." (State's Exh. 28).

[9] On May 7, 2014, the State filed an Information, charging Sciaraffa with Count I, dealing in methamphetamine, a Class B felony; Count II, possession of methamphetamine, a Class D felony; Count III, possession of chemical agents or precursors with the intent to manufacture a controlled substance, a Class D felony; Count IV, maintaining a common nuisance, a Class D felony; and Count V, possession of paraphernalia, a Class A misdemeanor. In addition, the State filed an Information alleging Sciaraffa to be an habitual substance offender. On May 12, 2014, the State dismissed Count IV and Sciaraffa proceeded to trial on the remaining charges.

[10] On August 13 through August 14, 2014, the trial court conducted a bifurcated jury trial. At the close of the evidence, the jury returned a guilty verdict on all four Counts. Thereafter, the jury also determined that Sciaraffa was an habitual substance offender. On September 8, 2014, the trial court sentenced Sciaraffa to twenty years for Class B felony dealing in methamphetamine, a concurrent

three years for Class D felony possession of methamphetamine, a concurrent three years for Class D felony maintaining a common nuisance, and a consecutive one year for Class A misdemeanor possession of paraphernalia. The trial court enhanced the sentence for Sciaraffa's Class B felony with eight years for the habitual substance offender adjudication. In sum, Sciaraffa received an aggregate twenty-nine-year sentence.

[11] Sciaraffa now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Admission of Evidence*

[12] First, Sciaraffa contends that the trial court abused its discretion when it admitted into evidence the presumptively positive test results for methamphetamine found in the glass bottle. Our standard of review for rulings on the admissibility of evidence is well-settled. Admission or exclusion of evidence rests within the trial court's sound discretion and its decision is reviewed for an abuse of that discretion. *Southward v. State*, 957 N.E.2d 975, 977 (Ind. Ct. App. 2011). The trial court's decision must be clearly erroneous and against the logic and effect of the facts and circumstances before it constitutes an abuse of discretion. *Id.*

[13] Sciaraffa admits that he failed to object to the admission of the evidence at issue, thereby failing to preserve his claim for appellate review. *See id.* To avoid the review of his argument being waived, he invokes the fundamental

error doctrine which permits appellate review of otherwise procedurally defaulted claims. *Id.* As our supreme court has noted, this narrow doctrine may lead to reversal where there has been a "blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process." *Matthews v. State*, 849 N.E.2d 578, 587 (Ind. 2006).

[14] Focusing on the foundational requirements for the admission of evidence, Sciaraffa contends that Scientist Burrow's failure to explain the scientific principles and standards of a presumptively positive test should have excluded its presentation from the jury. Because of the State's "heavy" reliance on the erroneously admitted test in its prosecution of Sciaraffa, the jury was "highly likely" influenced to return a guilty verdict. (Appellant's Br. p. 14).

[15] Pursuant to Indiana Rule of Evidence 702, expert scientific testimony is admissible only if reliability is demonstrated to the trial court. The Rule provides

> (a) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.
> (b) Expert scientific testimony is admissible only if the court is satisfied that the expert testimony rests upon reliable scientific principles.

The proponent of expert testimony bears the burden of establishing the foundation and reliability of the scientific principles. *Doolin v. State*, 970 N.E.2d 785, 787 (Ind. Ct. App. 2012). There is no specific test that must be considered

in order to satisfy Rule 702(b). *Id*. Rather, reliability may be established by judicial notice or, in its absence, by sufficient foundation to convince the trial court that the relevant scientific principles are reliable. *Id*. In concluding that scientific evidence is reliable, the trial court must determine whether the evidence appears sufficiently valid, or, in other words, trustworthy, to assist the trier of fact. *Id*.

[16] In support of his argument, Sciaraffa references *Doolin* and *Burkett v. State*, 691 N.E.2d 1241 (Ind. Ct. App. 1998), *trans. denied*, for the proposition that the testimony must include an explanation of the nature of the presumptive test and its reliability. In *Burkett*, police stopped a speeding car, driven by Burkett. Burkett failed the field sobriety test and a portable breath test. *Burkett*, 691, N.E.2d at 1243. Before he was transported to jail, the officer conducted a patdown search for his safety. *Id*. During this search, the officer discovered a green, leafy substance in Burkett's pocket, which, after conducting a field test, yielded a positive result for marijuana. *Id*. On appeal, we upheld the trial court's decision that the officer was a qualified expert because he testified that: (1) he was trained to administer the test; (2) he followed the proper procedures; (3) the test consisted of three ampoules of acid that change color to show the presence of marijuana; and (4) the sheriff's department routinely used the test. *Id*. at 1245.

[17] Although *Doolin* presented similar circumstances as *Burkett*, we reached the opposite result. While the officer in *Doolin* provided a general overview of the steps he intended to follow when conducting the field test, he did not testify as

to any specific name or otherwise identify the test, indicate its reliability, the scientific principles on which it was based, or recognize any standards regarding its use and operation. *Doolin*, 970 N.E.2d at 789. In fact, we noted that the officer's explanation at trial was nothing more than to "break an ampoule of something over the challenged plant material and shake it up. If whatever is in the ampoule causes the material to turn blue, it's marijuana." *Id*. Due to the lack of any foundational evidence, the *Doolin* court concluded that the State failed to establish the test's reliability under Evid. R. 702(b). *Id*.

[18] We find Sciaraffa's equation of Scientist Burrow's chemical tests with the quick, on-the-scene field tests performed by an officer unpersuasive. Scientist Burrow is a professional forensic scientist with the Indiana State Police Laboratory and has an extensive education and experience in drug analysis. She testified to the specific test performed on the glass bottle, which presumptively "indicated the presence of [m]ethamphetamine." (State's Exh. 28). She elaborated that she performed a "Thimlar chromatography test and a gas chromatography/mass spectrometry test" on the specimen. (Tr. p. 202). These are the "specialized tests" that are part of the normal testing procedure and which require "expert training to administer." (Tr. p. 203). Both of these tests are "generally accepted in the relevant scientific community." *Markley v. State*, 603 N.E.2d 891, 893 n.5 (Ind. Ct. App. 1992), *trans. denied*.

[19] In order to identify a controlled substance in a specimen, Scientist Burrow is required to perform at least two tests: "one being a presumptive test and one being a confirmatory test." (Tr. p. 206). The presumptive test on the glass

bottle indicated the presence of methamphetamine; however, "there wasn't enough sample" to confirm the presumptive testing's result. (Tr. p. 206). As such, Scientist Burrow was not "scientifically certain that it was methamphetamine." (Tr. p. 206). The mere fact that she could not perform a confirmatory test does not invalidate the test or inhibit its admissibility but rather reflects on the weight of her testimony. *See McKnight v. State*, 1 N.E.3d 193, 203-04 (Ind. Ct. App. 2013) (finding that any inaccuracy in the scales used to weigh the cocaine went to the weight of the evidence and not its admissibility).

[20] Based on Scientist Burrow's testimony, we conclude that the State properly established the foundation and reliability underlying the scientific principles of the test performed on the glass bottle in accordance with Evid. R. 702(b). Therefore, there was no error, let alone a fundamental error, in the trial court's admission of the evidence.

## II. *State's Closing Argument*

[21] Next, Sciaraffa contends that the State committed prosecutorial misconduct when it indicated during closing argument that the State had located actual methamphetamine during the search of the residence.

[22] In reviewing a claim of prosecutorial misconduct properly raised in court, we determine whether (1) misconduct occurred, and if so, (2) whether the misconduct, under all the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected to otherwise.

*Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014), *reh'g denied*. A prosecutor has the duty to present a persuasive final argument and thus placing a defendant in grave peril, by itself, is not misconduct. *Id.* "Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct." *Id.* (quoting *Cooper v. State*, 854 N.E.2d 831, 835 (Ind. 2006)). To preserve a claim of prosecutorial misconduct, the defendant must—at the time the alleged misconduct occurs—request an admonishment to the jury, and if further relief is desired, move for a mistrial. *Id.*

[23] Sciaraffa did not raise any objection to nor seek relief from the prosecutor's remarks during trial; rather, the record reflects that he acknowledged to the jury that he intentionally failed to object to the contested statements. In order to avoid procedural default, he now asserts that the State's remarks constituted fundamental error. In evaluating Sciaraffa's claim, we look, in addition to the customary requirements of the doctrine, at the alleged misconduct in the context of all that happened and all relevant information given to the jury— including evidence admitted at trial, closing argument, and jury instructions— to determine whether the misconduct has such an undeniable and substantial effect on the jury's decision that a fair trial was impossible. *Id.*

[24] We stress that "[a] finding of fundamental error essentially means that the trial [court] erred . . . by not acting when he or she should have." *Id.* (quoting

*Whiting v. State*, 969 N.E.2d 24, 34 (Ind. 2012)). Fundamental error is meant to permit appellate courts a means to correct the most egregious and blatant trial errors that otherwise would have been procedurally barred, not to provide a second bite at the apple for defense counsel who ignorantly, carelessly, or—like here—strategically failed to preserve an error. *Id.*

[25]     In closing argument, the State argued:

> What do I have to prove? That a person, [Sciaraffa], knowingly or intentionally manufactured methamphetamine pure or adulterated. So I have to prove that it was the defendant, [Sciaraffa]. [Bragg] said it was him. She knows him. She lived with him for three years. She said she saw him do it. How do we know it was knowingly or intentionally? She saw him take the steps, she handed him a fuel can, she saw him burping the vessel, those are things that he was doing intentionally. He knew what he was doing. How do we know it was manufactured? We have the remnants. We have [Bragg's] testimony and most importantly we have the final product. [Bragg] told you the night that he was making it they each had some. That it was the same methamphetamine she has had every time. It gave her the same effect that she knew it was methamphetamine. They used it again the next morning. We know just like making cookies if you take some of the steps out, if you are not manufacturing them, if you are not baking them you don't have the right finished product. We know he manufactured because he had the finished product. [Bragg] saw him do it, we have the remnants to prove he did it and we have the finished product to show that he did it. . . . I anticipate [defense counsel] is going to get up here and say well you didn't find everything. . . . I don't have to give you every ingredient. Why is that? Because just like when you bake cookies the ingredients go in and the sugar dissolves, the eggs get mixed in, you no longer have those individual ingredients. But again we know that the manufacturing, the baking, takes place because you have the finished product. . . . We know that they were all there, that they all went in because we have the finished product.

(Tr. pp. 221-23). Pointing to the lack of "actual methamphetamine in evidence," Sciaraffa maintains that the prosecutor's statements of "he had the finished product" and "we have the final product" suggest to the jury that the State "had actual evidence of methamphetamine in its possession that had been excluded from presentation at trial." (Appellant's Br. p. 10). We disagree.

[26] Placed within the context of the closing argument, the State's remark that "he had the finished product" clearly referred to a permissible inference made from analysis of the evidence presented at trial. *Poling v. State*, 938 N.E.2d 1212, 1217 (Ind. Ct. App. 2010). The State argued that Bragg's testimony established the manufacturing process, up to the consumption of the actual methamphetamine—in other words, the final product. Bragg testified to the jury that she aided Sciaraffa, she saw him burp the vessel, and shared some of the drug.

[27] Furthermore, Sciaraffa's argument that the State's use of the term "we" alludes to the cover-up of evidence is equally without merit. At trial, Sergeant Patrick Zeider (Sergeant Zeider) explained to the jury that "all the liquids [he] located, [he] tested" with water and pH paper on the scene. (Tr. p. 176). He also specified that he only took samples from two containers: the Gatorade bottle and the glass bottle with the milky, oily content. Sergeant Zeider clarified that he placed the samples in evidence bags, properly labeled them, and delivered them to the State Police Laboratory for further analysis by Scientist Burrow.

[28] Overall, the jury received preliminary and final instructions with correct statements of the law. The court's preliminary instruction No. 20 cautioned the jury that "[w]hen the evidence is completed, the attorneys will make final arguments. These final statements are not evidence. The attorneys are permitted to characterize the evidence, discuss the law and attempt to persuade you to a particular verdict. You may accept or reject those arguments as you see fit." (Tr. Vol. 6 Jury Instructions). Viewed in the totality and context of the evidence, we conclude that the State's comments during closing argument fell within the bounds of prosecutorial advocacy and no misconduct, let alone fundamental error, occurred.

### III. *Sufficiency of the Evidence.*

[29] Lastly, Sciaraffa contends that the State failed to present sufficient evidence beyond a reasonable doubt to support his conviction for dealing in methamphetamine, a Class B felony. Generally, in addressing a claim of insufficient evidence, an appellate court must consider only the probative evidence and reasonable inferences supporting the judgment, without weighing evidence or assessing witness credibility, and determine therefrom whether a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Glenn v. State*, 884 N.E.2d 347, 355 (Ind. Ct. App. 2008), *trans. denied*.

[30] To convict Sciaraffa of dealing in methamphetamine, the State was required to establish that Sciaraffa knowingly or intentionally manufactured

methamphetamine, pure or unadulterated. *See* I.C. § 35-48-4-1.1(a)(2013). Focusing on Bragg's testimony, Sciaraffa claims that "Bragg testified that she smoked methamphetamine twice with Sciaraffa but there was no evidence showing beyond a reasonable doubt that Sciaraffa actually made the methamphetamine that she claims they smoked together." (Appellant's Br. p. 15). Insofar as Sciaraffa disputes Bragg's testimony and requests this court to reweigh her credibility, we decline his invitation as this is the "jury's exclusive province." *McHenry v. State*, 820 N.E.2d 124, 126-27 (Ind. 2005). Considering the evidence presented at trial, we conclude that the State carried its burden of proof.

[31] Bragg testified that she saw Sciaraffa manufacture methamphetamine using the "shake and bake" method during the evening of May 1 and into the early morning hours of May 2, 2014. (Tr. p. 131). She noticed Sciaraffa "burp" the vessel several times to release the gasses which had build up inside. (Tr. p. 126). She admitted that when the process reached its conclusion, she and Sciaraffa sampled the product by smoking a small portion. Around 11 a.m. that morning, Bragg wanted to catch another buzz, and she informed the jury that both she and Sciaraffa smoked methamphetamine from a pipe in the garage, after which Sciaraffa handed her a small amount in a little bag to consume later. Bragg's testimony is underscored by her self-professed four-year addiction to methamphetamine; she knew what it looked like and was well-versed in the manufacturing process.

During a search of the residence later that same day, law enforcement officers noticed a chemical-type smell emitting from the garage. Throughout Sciaraffa's residence, the officers also located items associated with the manufacture of methamphetamine, including stripped lithium battery casings and a glass bottle, which presumptively tested positive for methamphetamine. Mindful of the testimony and evidence presented at trial, we conclude that the State sufficiently supported Sciaraffa's conviction for Class B felony dealing in methamphetamine.

## CONCLUSION

Based on the foregoing, we hold that no fundamental error occurred during the admission of the presumptive positive test for methamphetamine or the State's closing arguments. We also conclude that the State presented sufficient evidence beyond a reasonable doubt to sustain Sciaraffa's conviction for dealing in methamphetamine.

Affirmed.

Vaidik, C. J. and Baker, J. concur