## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 04 2018, 8:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Elizabeth A. Bellin
Elkhart, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Marvin J. Bufkin, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | June 4, 2018 <br><br> Court of Appeals Case No. <br> 20A03-1712-CR-2827 <br><br> Appeal from the Elkhart Superior Court <br><br> The Honorable Teresa L. Cataldo, Judge <br><br> Trial Court Cause No. <br> 20D03-1604-F3-14 |

**Altice, Judge.**

## Case Summary

Marvin Bufkin appeals his conviction for Level 3 felony rape, as well as his partially-suspended, fourteen-year sentence. He presents three issues for our review:

1. Is the conviction supported by sufficient evidence?

2. Did the admission of certain evidence constitute fundamental error?

3. Is Bufkin's sentence inappropriate in light of the nature of the offense and his character?

We affirm.

## Facts & Procedural History

On Friday September 19, 2015, Bufkin's fourteen-year-old daughter K.B. and two of her friends of the same age, R.B. and J.M., spent the night at Bufkin's home. This was J.M.'s first time meeting Bufkin. K.B. lived with her mother, but she had recently started spending some overnights with Bufkin, who was less strict than her mother. K.B.'s eighteen-year-old, half-brother Christian was also staying there. Bufkin had been a father figure to Christian since birth but was not Christian's biological father.

[4]     When the girls woke the next morning, Bufkin had already left for work. Bufkin returned home sometime after 5:00 p.m. and began drinking large amounts of vodka. At some point, he told the girls that he had purchased a bottle of vanilla vodka for them to share. K.B. and R.B. each tried a small amount and thought it was disgusting, so they did not have more. J.M., however, drank up to ten shots over a few hours. Bufkin also provided J.M. with beer and challenged her to chug it. J.M. became extremely intoxicated and had difficulty walking. Additionally, J.M. started being "lovey dovey" with everyone and "a little flirty" with Bufkin, who was also intoxicated. *Transcript Vol. II* at 163. When J.M. walked to the bathroom, Bufkin made a crude comment regarding the shape of J.M.'s body.

[5]     The group's plans to go bowling that night were delayed by the drinking, but they eventually left around 10:00 p.m. Christian had not been drinking, so he drove with Bufkin in the front passenger seat and the girls in the back. When they reached the bowling alley, Christian indicated that J.M. was too intoxicated to be in public. Accordingly, the plans changed. Christian drove J.M. and Bufkin home, while R.B. and K.B. met up with a friend and agreed to be home by 1:30 or 2:00 a.m.

[6]     After Christian, Bufkin, and J.M. returned home, J.M. apparently vomited. She then laid down on a brown loveseat and passed out. Christian placed a blanket over her and tucked her in. Christian eventually fell asleep on another couch in the same room.

[7] K.B. and R.B. returned home around 12:30 a.m. and could hear loud music as they approached the home. K.B. opened the front door and immediately saw the back of her father. Bufkin was completely naked from the waist down and bent over the arm of the brown couch where J.M. lay. R.B. had a better angle to see J.M. and observed that J.M.'s pants were pulled down to her mid-thighs. Bufkin turned and looked at the girls when they entered but then turned back to J.M. and got closer to her. Scared of what Bufkin might do, the girls slowly walked toward the attached kitchen. Bufkin said nothing and eventually walked past them into his bedroom, where he locked the door. J.M. was still passed out on the couch, with her pants unbuttoned and partially pulled down.

[8] K.B. then rushed over to wake Christian, who was in a deep sleep on the couch. She screamed and shook him as she said, "I think dad just raped J.M." *Id*. at 116. Christian jumped up and ran to Bufkin's bedroom door, kicking in the door. He yelled at Bufkin, who denied that anything happened. The two came out of the bedroom, and Christian pointed out that Bufkin's shorts were on sideways and that J.M.'s blanket was on the floor.

[9] In the meantime, K.B. called her mother in a panic. Her mother rushed to the scene while calling 911. J.M. awoke during the commotion, confused and unaware of what had happened. Her last memory was being in the parking lot of the bowling alley. After waking, J.M. noticed that her pants were unbuttoned and there was "white stuff" on them. *Id*. at 197.

[10] Officers with the Elkhart County Sheriff's Department, including Corporal Joseph Milovich, were dispatched to the home at 12:38 a.m. in response to "a rape in-progress call." *Id.* at 49. Corporal Milovich encountered the girls in K.B.'s mother's vehicle. They were crying hysterically and "talking very fast and frantically". *Id.* at 59. K.B. and R.B. told Corporal Milovich that they saw Bufkin "on top of J.M., without his pants, he was laying on top of her, she was on a couch and her pants were down, that she was passed out." *Id.* at 60.

[11] J.M. was taken by ambulance to Elkhart General Hospital for a sexual assault examination. The physical examination revealed that J.M. had slight erythema/redness on the inner labia of her vagina. This is a "very non-specific finding" possibly indicating "some irritation or trauma, some rubbing". *Transcript Vol. III* at 82. A sexual assault kit was completed, which included collection of vaginal cervical swabs. Additionally, J.M.'s blood alcohol content was determined to be 0.120 at the time of testing, approximately 3:30 a.m.

[12] DNA swabs from J.M. and Bufkin were analyzed by two forensic biologists with the Indiana State Police Laboratory. Initial presumptive testing done by Kimberly Marshall indicated the possible presence of seminal material in some swabs taken from J.M., but additional confirmatory testing was negative. Further, Marshall determined that an insufficient quantity of male DNA existed

for autosomal STR analysis.  Accordingly, Marshall referred the case to a colleague, Melissa Meyers, to perform Y-STR testing.[1]

[13]   The Y-STR analysis performed by Meyers in February 2016 resulted in more conclusive results.  Meyers determined that the Y-STR profile obtained from the swabs of J.M.'s vaginal cervical area was consistent with the Y-STR profile obtained from Bufkin.  Thus, Bufkin (along with all of his male paternal relatives) could not be excluded as potential Y-STR contributors.  Meyers made essentially the same findings with respect to a swab of J.M.'s anal area.

[14]   On April 18, 2016, the State charged Bufkin with Level 3 felony rape and Level 4 felony sexual misconduct with a minor.  Bufkin's jury trial was held September 25 to September 27, 2017.  The jury found him guilty as charged, and the trial court entered judgments of conviction on both counts.  At the sentencing hearing on November 2, 2017, the trial court vacated the conviction for sexual misconduct with a minor.  With respect to the rape conviction, the trial court sentenced Bufkin to fourteen years in prison, with three years suspended to probation.  Additional information will be provided below as needed.

**Discussion & Decision**

---

[1] This newer type of analysis is a "male-specific DNA test" that "look[s] at DNA that is located on the Y chromosome only."  *Id.* at 8.  Meyers explained that when developing a Y-STR profile, male paternal relatives cannot be excluded from the profile.  The statistical calculation used with Y-STR analysis differs from traditional DNA analysis but is "still a reliable method".  *Id.* at 15.

# 1. Sufficiency

[15] When we consider a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor assess the credibility of the witnesses. *Suggs v. State*, 51 N.E.3d 1190, 1193 (Ind. 2016). Instead, we consider only the evidence and reasonable inferences supporting the conviction. *Id.* We will affirm if there is probative evidence from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id.*

[16] As charged, the State was required to establish that Bufkin knowingly had sexual intercourse with J.M. or caused her to submit to other sexual conduct when J.M was unaware that the sexual intercourse or other sexual conduct was occurring. Ind. Code § 35-42-4-1(a)(2); *Appendix Vol. II* at 17. "Sexual intercourse" is an act that "includes any penetration of the female sex organ by the male sex organ." Ind. Code § 35-31.5-2-302. "Other sexual conduct" is defined to include an act involving "the penetration of the sex organ…of a person by an object." I.C. § 35-31.5-2-221.5.

[17] In challenging the sufficiency of the evidence, Bufkin asserts that the only evidence he engaged in sexual intercourse or other sexual contact with J.M. was that the Y-STR results from one vaginal cervical swab could not exclude him as a DNA contributor, nor any of his male relatives. Bufkin also notes that Christian was sleeping on another couch in the same room as J.M. We reject this blatant request to reweigh the evidence.

[18]   The evidence favorable to the conviction reveals that after supplying fourteen-year-old J.M. with alcohol, Bufkin found an opportunity to take advantage of her. When his daughter and R.B. returned home earlier than expected, they found Bufkin naked from the waist down and leaning over J.M. from the end of the couch. J.M. was passed out on the couch with her pants pulled down to her mid-thighs. The blanket that had been covering J.M. was on the floor. Bufkin said nothing to the girls when they entered. He simply looked at them and then turned his attention back to J.M., likely pulling up her pants. He then went into his bedroom and locked the door. When J.M. was eventually awakened by her hysterical friends, she noticed that her pants were unbuttoned and there was "white stuff" on her jeans. *Transcript Vol. II* at 197. From this evidence, it could reasonably be inferred that Bufkin had engaged in some kind of sexual contact with J.M., who was unaware due to her intoxication.

[19]   Bufkin focuses his sufficiency argument on the purported lack of evidence regarding penetration. The evidence, however, indicates that J.M. had redness on the inner labia of her vagina after her encounter with Bufkin. More notably, the DNA evidence reveals that swabs taken from J.M.'s cervix had a Y-STR profile consistent with Bufkin's Y-STR profile. This means that Bufkin and his male paternal relatives could not be excluded as potential contributors to the sample. Considering all of the evidence in the case, we find unpersuasive Bufkin's suggestion that the male-specific DNA found inside J.M.'s vagina

could have belonged to someone other than him.[2] In sum, we conclude that a reasonable jury could find beyond a reasonable doubt that Bufkin knowingly penetrated J.M.'s vagina with his penis, finger, or some other object while she was unaware of such sexual conduct.

## 2. Admission of Evidence

[20] Next, Bufkin complains that two witnesses – K.B. and Corporal Milovich – were allowed to offer legal conclusions as to the ultimate issue in violation of Indiana Evidence Rule 704(b).[3] Bufkin directs us to Corporal Milovich's testimony that he responded to the scene in response to "a rape in-progress call." *Transcript Vol. II* at 49. Additionally, Bufkin notes K.B.'s testimony that when she screamed to wake Christian, she said, "I think dad just raped J.M." *Id.* at 116. Acknowledging that he did not preserve the alleged errors below, Bufkin now asserts fundamental error to avoid waiver.

[21] The fundamental error exception permits appellate review of otherwise procedurally defaulted claims. *Sciaraffa v. State*, 28 N.E.3d 351, 356 (Ind. Ct. App. 2015), *trans. denied*. This exception to the waiver rule is extremely narrow

---

[2] To the extent Bufkin suggests Christian might have been the source of the DNA, we observe that the evidence indicates Bufkin is not Christian's biological son.

[3] Evid. R. 704(b) precludes witnesses from "testify[ing] to opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." "The jury, not the witness, is responsible for deciding the ultimate issues in a trial, and opinion testimony concerning guilt 'invaded the province of the jury in determining what weight to place on a witness' testimony.'" *Williams v. State*, 43 N.E.3d 578, 582 (Ind. 2015) (quoting *Blanchard v. State*, 802 N.E.2d 14, 34 (Ind. Ct. App. 2004)).

and its proponent – here Bufkin – "bears the heavy burden of showing that a fair trial was impossible." *Harris v. State*, 76 N.E.3d 137, 139 (Ind. 2017). To meet this daunting standard, Bufkin is required to "show that the trial court should have raised the issue sua sponte due to a blatant violation of basic and elementary principles, undeniable harm or potential for harm, and prejudice that makes a fair trial impossible." *Id.* at 140.

[22] Contrary to his assertions on appeal, Corporal Milovich did not opine during his testimony that Bufkin raped J.M. Corporal Milovich simply testified that he responded to a "rape in-progress call." *Transcript Vol. II* at 49. He did not testify that Bufkin raped J.M., he offered no opinion on the veracity of the information he received at the scene, and he did not testify as to his opinions regarding guilt in this case. Corporal Milovich's testimony did not implicate Evid. R. 704(b).

[23] Similarly, K.B. did not express an opinion at trial regarding Bufkin's guilt or innocence. Her testimony focused on her observations and actions on the night in question. In describing her reaction to finding Bufkin and J.M., however, K.B. testified: "My mind is still going, trying to comprehend what I just seen, and I screamed and bawled my eyes out and shook my brother and woke him up and said, '*I think dad just raped J.M.*'" *Id.* at 116 (emphasis supplied). The State incorrectly argues, without citation to supporting authority, that this testimony does not implicate Evid. R. 704(b) because the opinion statement was not originally made in court. *See Smith v. State*, 721 N.E.2d 213, 217 (Ind. 1999) ("The same reasoning underlying Rule 704(b)'s prohibition of opinions of guilt

during live in-court testimony applies to statements offered at trial that were made at another time or place.").

[24] Even assuming that this small portion of K.B.'s testimony was inadmissible, we cannot conclude that its admission made a fair trial impossible. K.B.'s testimony as a whole made clear that she did not actually witness Bufkin rape J.M. Further, K.B. simply noted the frantic statement made to her brother, which was understandable given the situation she had just encountered. K.B. did not go further and offer an opinion at trial about the ultimate issue of whether her father had, in fact, raped J.M. Had Bufkin objected, he could have obtained an admonishment. But he has not established on appeal that this evidentiary error rose to the level of fundamental error.

### 3. Sentence

[25] Finally, Bufkin challenges his sentence as inappropriate in light of his character and the nature of his offenses. Although a trial court may have acted within its lawful discretion in imposing a sentence, Article 7, Sections 4 and 6 of the Indiana Constitution authorize independent appellate review and revision of a sentence imposed by the trial court. *Alvies v. State*, 905 N.E.2d 57, 64 (Ind. Ct. App. 2009). This appellate authority is implemented through Indiana Appellate Rule 7(B), which provides that a court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." *Anglemyer v. State*, 868 N.E.2d 482, 491 (Ind. 2007),

*clarified on reh'g*, 875 N.E.2d 218. Nevertheless, "we must and should exercise deference to a trial court's sentencing decision, both because Rule 7(B) requires us to give 'due consideration' to that decision and because we understand and recognize the unique perspective a trial court brings to its sentencing decisions." *Stewart v. State*, 866 N.E.2d 858, 866 (Ind. Ct. App. 2007). The appellant bears the burden of persuading us that his sentence is inappropriate. *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006).

[26] The determination of whether we regard a sentence as inappropriate "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Bethea v. State*, 983 N.E.2d 1134, 1145 (Ind. 2013) (*quoting Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008)). "The principal role of such review is to attempt to leaven the outliers." *Chambers v. State*, 989 N.E.2d 1257, 1259 (Ind. 2013). It is not our goal in this endeavor to achieve the perceived "correct" sentence in each case. *Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014). Accordingly, "the question under Appellate Rule 7(B) is not whether another sentence is *more* appropriate; rather, the question is whether the sentence imposed is inappropriate." *King v. State*, 894 N.E.2d 265, 268 (Ind. Ct. App. 2008) (emphasis in original).

[27] To assess the appropriateness of a sentence, we look first to the statutory range established for the classification of the relevant offense. Level 3 felony rape has a sentencing range of three to sixteen years, with the advisory sentence being nine years. *See* Ind. Code § 35-50-2-5(b). Thus, Bufkin received a sentence that

was two years shy of the maximum, and three years of this sentence was suspended to probation.

[28] The nature of the rape in this case supports a sentence above the advisory. While having three fourteen-year-old girls in his care for the night, Bufkin – age forty-one at the time – became intoxicated himself and provided the girls with their own bottle of vanilla vodka to share. This resulted in J.M. drinking up to ten shots and becoming extremely intoxicated, all while Bufkin encouraged her to continue drinking and participate in drinking contests. Later that night, J.M. vomited and then passed out on a couch. Shortly thereafter, Bufkin sexually assaulted the young girl, even while Christian slept on another couch in the same room. Bufkin's own daughter then walked in on him in the midst of the rape of her friend.

[29] Turning to Bufkin's character, we observe that he has a significant criminal history. Between 2003 and 2010, Bufkin was convicted of two felonies and eight misdemeanors. Of particular note, Bufkin has past convictions for escape, battery, resisting law enforcement, domestic battery, and possession of cocaine. He also violated probation twice in 2006 and 2007. Additionally, Bufkin has a history of drug and alcohol abuse, which the trial court aptly observed has been "the underlying tone of [Bufkin's] entire criminal history". *Transcript Vol. IV* at 6. Despite receiving lenient sentences and addiction treatment in the past, Bufkin has continued to abuse substances and has failed to substantially reform his criminal behavior.

[30]     After considering the nature of the offense and Bufkin's character, we conclude that the fourteen-year, partially-suspended sentence imposed by the trial court is not inappropriate.

[31]     Judgment affirmed.

[32]     Najam, J. and Robb, J., concur.