
# IN THE SUPREME COURT OF GUAM

**PEOPLE OF GUAM,**
Plaintiff-Appellee,

**v.**

**PHILLIP VINCENT CASO,**
Defendant-Appellant.

Supreme Court Case No.: CRA19-006
Superior Court Case No.: CF0585-18

## OPINION

## Cite as: 2022 Guam 6

Appeal from the Superior Court of Guam
Argued and submitted on August 24, 2021
Via Zoom video conference

Appearing for Defendant-Appellant:
Peter C. Perez, *Esq.*
Law Office of Peter C. Perez
DNA Bldg.
238 Archbishop Flores St., Ste. 802
Hagåtña, GU 96910

Appearing for Plaintiff-Appellee:
Sean Brown, *Esq.*
Assistant Attorney General
Office of the Attorney General
Prosecution Division
590 S. Marine Corps Dr., Ste. 901
Tamuning, GU 96913

**E-Received**
7/13/2022 4:22:14 PM

BEFORE: F. PHILIP CARBULLIDO, Chief Justice; ROBERT J. TORRES, Associate Justice; and KATHERINE A. MARAMAN, Associate Justice.

**MARAMAN, J.:**

[1]     Defendant-Appellant Phillip Vincent Caso appeals a final judgment of conviction for one count of Delivery of a Schedule II Controlled Substance (as a First Degree Felony) in violation of 9 GCA § 67.401.1(a)(1) and (b)(1) and one count of Possession of a Schedule II Controlled Substance (as a Third Degree Felony) in violation of 9 GCA § 67.401.2(a) and former (b)(1). On appeal, Caso argues the trial court erred in admitting improperly authenticated evidence, failing to make adequate findings to designate a witness as an expert witness, admitting allegedly unreliable expert testimony, and admitting hearsay statements. Caso argues that the prejudicial effect of these evidentiary errors warrants a reversal of the trial court's decision and an order for a new trial. For the reasons discussed below, we affirm the conviction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

[2]     Caso was arrested following a "controlled buy" by the Guam Police Department's ("GPD") *Mandaña* Task Force. Caso was indicted on one count of Delivery of a Schedule II Controlled Substance (as a First Degree Felony) and one count of Possession of a Schedule II Controlled Substance (as a Third Degree Felony). After a jury trial, Caso was convicted of both counts. Caso timely appeals his conviction.

[3]     The controlled buy was conducted with the cooperation of a source of information, Cheryl Brewer. Before the controlled buy, Brewer was found with methamphetamine on her person and identified Caso as her source. Brewer agreed to cooperate in conducting a controlled buy targeting Caso.

[4]     Brewer and her vehicle were "sanitized" by Officer Joneen Terlaje before the controlled buy. Transcript ("Tr.") at 5, 75 (Jury Trial, Feb. 26, 2019). This involved a search of her person and vehicle for drugs, weapons, and money. Officer Terlaje then fitted Brewer with a recording device. The audio feed was monitored in real time by Officer Christopher Champion, who stationed his vehicle near Caso's home, where the controlled buy was to take place.

[5]     The conversation between Caso and Brewer was recorded during the controlled buy. The trial transcript noted that the recording was "inaudible" in many places. *Id.* at 20-22. Officer Champion testified that the quality of the recording was low, but he could recognize the voices of Brewer and Caso and also understand parts of their conversation. Officer Champion also testified that the recording was a fair and accurate representation of what he heard during the controlled buy. This recording was admitted into evidence as Exhibit 12.

[6]     After completing the controlled buy, Brewer was followed to a pre-arranged location by Officer Terlaje and Customs Officer Eugene Igros. Officer Terlaje testified that at the pre-arranged location, Brewer handed her a baggie containing a crystalline substance. Officer Terlaje then transported the evidence to the *Mandaña* Task Force office, where she tested the substance with a field test kit. The field test produced a presumptive positive for methamphetamine. Officer Terlaje then attached an evidence custody receipt to the evidence and submitted that evidence to the GPD Crime Lab. The methamphetamine recovered from Brewer was admitted into evidence as Exhibit 13 before Officer Terlaje's testimony. Officer Terlaje was presented with Exhibit 13 at the time of her testimony, and she identified Exhibit 13 as containing her evidence label and handwriting.

[7]     Sometime later, GPD Criminalist John Cayton, an employee of the Crime Lab, performed several tests on Exhibit 13 including a stereoscopic examination, a "color test," and analysis using a Fourier transform infrared spectrometer ("FTIR"). *Id.* at 96. Cayton received a presumptive

positive result for methamphetamine from the color test. At trial, Cayton opined that the FTIR analysis indicated Exhibit 13 contained methamphetamine hydrochloride based on a comparison of the results of the test with a known sample of methamphetamine hydrochloride.

[8]      At trial, Officer Champion identified Exhibit 13 as the "suspected methamphetamine" seized from Brewer following the controlled buy. *See id.* at 15-16. When presented with Exhibit 13, Officer Champion testified Exhibit 13 was a "vial of white crystalline substance" that was "the dope that was seized off of Cheryl." *Id.* at 16. When asked if Exhibit 13 was the same "dope" that he observed on the date of the controlled buy, Officer Champion responded, "It appears so, sir." *Id.* Officer Champion testified that the "suspected methamphetamine was field tested and [a] presumptive positive reading for methamphetamines was obtained." *Id.* at 15. When asked who performed the field test, Officer Champion testified, "I don't know off-hand." *See id.* Officer Champion stated that, based on the presumptive positive result, he "started working on the search warrant" for Caso's residence. *See id.* at 12, 15. Officer Champion testified that, aside from the results of the field test, he recognized the substance as methamphetamine based on his training and experience. Following this testimony, the trial court admitted Exhibit 13 without objection from defense counsel.

[9]      Officer Champion also authenticated Exhibit 12 with his testimony. Officer Champion testified that Brewer was fitted with an electronic monitoring device before the controlled buy, though Officer Terlaje was the officer who placed the device on her. Officer Champion testified that they tested the device to see if they could get "good audio." *Id.* at 10. Officer Champion testified that he arrived near the scene of the controlled buy before the other officers and Brewer so he could have good reception with the audio recording device. Officer Champion stated he was "monitoring" the conversation between Brewer and Caso in real time. *Id.* at 23. Officer Champion

testified that after hearing the copy of the audio recording, Exhibit 12, that it was a "fair and accurate representation" of the audio he heard on the date of the controlled buy. *Id.* at 22. Many parts of the recording were recorded in the transcript as "indiscernible," and Officer Champion agreed that the recording was of "very low quality." *Id.* at 18-23, 44. Officer Champion testified that the audio quality was of the same quality as it was when created. Officer Champion testified that, despite the low quality, he recognized what was said between Brewer and Caso.

[10]     Officer Igros testified that Brewer was summoned to the *Mandaña* Task Force office after she was found with "dope" earlier in the day. Officer Igros testified that Brewer was debriefed, and she revealed Caso as her source. Specifically, Officer Igros testified, "I asked her . . . where she got the dope that was found on her. She stated that she got it from Mr. Caso." *Id.* at 68. Officer Igros then provided testimony relating to how the controlled buy was organized and executed.

[11]     Officer Terlaje testified that Exhibit 13 was the bag of "crystalline substance" Brewer handed to her after the controlled buy at the pre-arranged location. *Id.* at 81-82. Officer Terlaje testified that her initials, identification number, and handwriting were on the packaging of the evidence admitted as Exhibit 13. Officer Terlaje testified she transported the evidence to the *Mandaña* Task Force officer, and, after performing certain tests, she attached an evidence receipt to the bag and submitted it to the Crime Lab.

[12]     Plaintiff-Appellee People of Guam ("People") called on GPD Criminalist Cayton to provide expert testimony identifying the substance in Exhibit 13 as methamphetamine.

//

//

//

## II. JURISDICTION

[13]    This court has jurisdiction to hear appeals from a final judgment of the Superior Court.  48 U.S.C.A. § 1424-1(a)(2) (Westlaw current through Pub. L. 117-159 (2022)); 7 GCA §§ 3107(b), 3108(a) (2005); 8 GCA §§ 130.10, 130.15(a) (2005).

## III. STANDARD OF REVIEW

[14]    "Where a party fails to object to the trial court's admission of evidence, we review the issue for plain error."  *People v. Roby*, 2017 Guam 7 ¶ 18 (quoting *Ramiro v. White*, 2016 Guam 6 ¶ 17). "On plain error review, we will not reverse unless '(1) there was an error; (2) the error is clear or obvious under current law; (3) the error affected substantial rights; and (4) reversal is necessary to prevent a miscarriage of justice or to maintain the integrity of the judicial process.'"  *Id.* (quoting *People v. Meseral*, 2014 Guam 13 ¶ 16) (footnote omitted).

## IV. ANALYSIS

### A.  Exhibit 13 (Methamphetamine) Was Properly Authenticated

[15]    Caso argues that the People "failed to establish any foundation upon which [Officer] Champion could testify to or authenticate Exhibit 13."  Appellant's Br. at 11 (Apr. 1, 2021).  Caso argues that Officer Champion was an incompetent witness to identify Exhibit 13 as the "dope" that was seized from Brewer and that Officer Champion lacked personal knowledge to identify Exhibit 13 as methamphetamine.  Caso argues that the trial court compounded the error by stating to the jury, "Exhibit 13 is now [admitted] into evidence and that's the methamphetamine."  Tr. at 17 (Jury Trial, Feb. 26, 2019).  Each argument is addressed below.[1]

---

[1] Caso also claims that Officer Champion lacked personal knowledge to testify that Exhibit 13 was methamphetamine and that his testimony was based on hearsay, derived from the statement of either the field test or the officer who conducted the field test.  Caso further argues that Officer Champion made several hearsay statements, including this statement regarding Exhibit 13.  The specific hearsay argument will be addressed later in this Opinion.

[16]    Guam Rule of Evidence ("GRE") 601 states: "Every person is competent to be a witness except as otherwise provided in these rules or by the laws of Guam."  Guam R. Evid. 601.  "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Guam R. Evid. 602.

[17]    "GRE 901 requires 'evidence sufficient to support a finding that the matter in question is what its proponent claims,' . . . for that evidence to be admissible."  *People v. Tuncap*, 2014 Guam 1 ¶ 31 (quoting Guam R. Evid. 901(a)).  "[I]n order '[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.'"  *United States v. Gadson*, 763 F.3d 1189, 1203 (9th Cir. 2014) (second alteration in original) (quoting Fed. R. Evid. 901(a)).  "[T]he party offering the evidence must make a prima facie showing of authenticity 'so that a reasonable juror could find in favor of authenticity or identification.'"  *Id.* (quoting *United States v. Chu Kong Yin*, 935 F.2d 990, 996 (9th Cir. 1991)).

### 1. Officer Champion's personal knowledge of Exhibit 13 as the "dope" seized from Cheryl Brewer

[18]    Caso argues that Officer Champion could not testify that Exhibit 13 was the "dope seized off of [Brewer]" as Officer Champion was not present when the item was seized, he was not the seizing officer, he was not the officer who received the evidence, and he did not testify on the chain of custody of Exhibit 13.  Appellant's Br. at 10-11.  The People argue that Officer Champion was a competent witness with personal knowledge of Exhibit 13 and that the prosecution established a proper foundation through Officer Champion's testimony about his background as a police officer, his knowledge of Brewer, his knowledge of the controlled buy, and his surveillance of the controlled buy via the audio recording device.

[19]     Officer Champion was involved with the first sanitization of Brewer's vehicle.  Following the controlled buy, Champion testified that Officers Igros and Terlaje followed Brewer to another pre-arranged location where they again sanitized Brewer's car and her person, recovering the evidence that would become Exhibit 13.  Officer Champion also testified that he went directly to his office after the controlled buy.  By his own testimony, Officer Champion stated that he did not participate in the recovery of evidence from Brewer at the second pre-arranged location.  Therefore, Officer Champion did not have personal knowledge if Exhibit 13 was, in fact, the evidence seized from Brewer following the controlled buy.

[20]     Officer Champion could not provide the testimony to authenticate Exhibit 13, and thus its admission was in error.  However, defense counsel did not object to the admission of Exhibit 13.  *See id.* at 19.  The error is reviewed for plain error.  *See Roby*, 2017 Guam 7 ¶ 18.

[21]     Officer Champion did not have personal knowledge to testify that Exhibit 13 was the "dope" seized from Brewer.  He was not present to receive the substance after the controlled buy from Brewer and did not have any involvement in the chain of custody.  The trial court committed error in allowing Officer Champion to testify to this point, and the error was clear and obvious.

[22]     But Officer Terlaje, who had knowledge of the controlled buy and was directly involved in the seizure of the evidence, testified at trial as to Exhibit 13's chain of custody, providing extensive and admissible testimony relating to the substance seized from Brewer.  Officer Terlaje testified extensively as to her involvement in preparing for the controlled buy and the seizure of the evidence admitted as Exhibit 13.  Officer Terlaje testified that Exhibit 13 was the bag of "crystalline substance" that Brewer handed to her after the controlled buy at the pre-arranged location.  Tr. at 80-81 (Jury Trial, Feb. 26, 2019).  Officer Terlaje testified that her initials, identification number, and handwriting were on the packaging of the evidence admitted as Exhibit

13.  Officer Terlaje testified she transported the evidence to the *Mandaña* Task Force office, and, after performing a methamphetamine-detecting field test, she attached an evidence receipt to the bag and submitted it to the Crime Lab.  Officer Terlaje had sufficient personal knowledge to testify as to the chain of custody of the evidence provided by Brewer and admitted as Exhibit 13.  Officer Terlaje's testimony provides sufficient foundation for a jury to conclude beyond a reasonable doubt that Exhibit 13 was authentic.  Caso was not prejudiced by the admission of this evidence.  Therefore, under the third prong of plain error review, Caso's substantial rights were not affected by the admission of Exhibit 13.

**2.  Officer Champion's personal knowledge of the field test conducted on Exhibit 13**

[23]    Caso next argues that Officer Champion lacked the personal knowledge to identify Exhibit 13 as the "suspected methamphetamine" that Brewer purchased during the controlled buy.  Appellant's Br. at 10.  Caso asserts that Officer Champion did not field test the seized substance and did not know who performed the field test, and thus lacked personal knowledge.  The People counter that Officer Champion was "aware" that another officer conducted a preliminary field test which returned a presumptive positive for methamphetamine.  Appellee's Br. at 13 (May 3, 2021).  And the People argue that Officer Champion also visually inspected Exhibit 13 on the witness stand and identified it as the "same dope" observed on the date which it was seized from Brewer.

[24]    When presented with Exhibit 13, Officer Champion testified Exhibit 13 "looks to be a vial of white crystalline substance" that was "the dope that was seized off of Cheryl."  Tr. at 16 (Jury Trial, Feb. 26, 2019).  When asked if Exhibit 13 was the same "dope" that he observed on the date of the controlled buy, Officer Champion responded, "It appears so, sir."  *Id.*  Before the prosecutor presented Exhibit 13 to Officer Champion, he testified that the "suspected methamphetamine was field tested and [a] presumptive positive reading for methamphetamine was obtained."  *Id.* at 15.

Officer Champion did not know who conducted the field test and was not present during the field test. When the prosecutor inquired why Officer Champion suspected that the substance was methamphetamine, Officer Champion stated that, aside from the field test, the contents of the vial were what he knew methamphetamine to look like based on his training. The prosecution elicited no other testimony relating to when or where Officer Champion previously "observed" the evidence seized from Brewer on the date of the controlled buy.

[25] Officer Champion did not have personal knowledge of the field test and lacked the personal knowledge to testify that the evidence seized from Brewer was "suspected methamphetamine" if his testimony was based on the results of the field test. As Officer Champion lacked personal knowledge for the chain of custody for Exhibit 13, and he lacked personal knowledge of the field test, he lacked the required personal knowledge to authenticate Exhibit 13 as the suspected methamphetamine seized from Brewer.

[26] The trial court admitted Exhibit 13 without objection from defense counsel. Therefore, we review for plain error. The admission of Officer Champion's testimony identifying Exhibit 13 as methamphetamine when he did not have personal knowledge of the field test was in error. *See Roby*, 2017 Guam 7 ¶ 18. But the erroneous admission of Exhibit 13, based on Champion's testimony, was not prejudicial to Caso and did not affect his substantial rights. Officer Terlaje testified that once she seized the substance from Brewer, she transported the evidence to the *Mandaña* Task Force office to test the substance. There, she tested the sample using the field test kit, which resulted in a presumptive positive for methamphetamines. Officer Terlaje then submitted the evidence to the Crime Lab for further testing.

[27] In *People v. Mateo*, 2017 Guam 22, we recognized that a police officer who testified to performing a field test that provided a presumptive positive for methamphetamine was sufficiently

reliable under the *Daubert* test to be admissible where a criminalist discussed the scientific basis for the field test conducted by the officer. 2017 Guam 22 ¶ 31; *see also Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993). In *Mateo*, the appellant challenged the reliability of the test on *Daubert* grounds, *see* 2017 Guam 22 ¶ 27, unlike this case where Caso challenges the testimony of Officer Champion as lacking personal knowledge of the field test result to testify to those results. Here, Officer Terlaje, and not Officer Champion, had sufficient personal knowledge to testify as to the results of the field test. Further, GPD Criminalist Cayton testified on the scientific basis for the field test and more specifically how the test is performed.[2] Therefore, though it was error for Officer Champion to testify as to the field test results of the substance admitted as Exhibit 13, the combined testimony of Officer Terlaje and Criminalist Cayton established sufficient foundational knowledge to identify Exhibit 13 as containing methamphetamine. Thus, Caso's substantial rights were not affected because of the trial court's error, and no plain error occurred.

### 3. Compound error

[28]     Caso argues that the errors claimed above were compounded when the trial court, in admitting Exhibit 13, stated, "Exhibit 13 is now into evidence and that's the methamphetamine." Appellant's Br. at 11. The People argue that any error in the admission of Exhibit 13 was remedied by later testimony of other witnesses. The People point to this court's finding in *Mateo* that the trial court did not commit plain error in admitting a presumptive field test into evidence. Appellee's Br. at 18 (citing *Mateo*, 2017 Guam 22 ¶ 33).

[29]     The People's argument is convincing. Though Officer Champion's testimony on Exhibit 13 was admitted in error, the later admission of Officer Terlaje's testimony about the presumptive positive test result and Criminalist Cayton's testimony relating to the results of the color testing

---

[2] Cayton testified that the "field tests" and the "color tests" operate on the same chemistry principles, though he did not specify that they are, in fact, the same tests. Transcript ("Tr.") at 93 (Jury Trial, Feb. 26, 2019).

and the FTIR analysis provided a sufficient basis to authenticate Exhibit 13. Still, the trial court's comment was inappropriate and, in another case, may have been prejudicial had the jury believed that the trial court had taken judicial notice that Exhibit 13 contained methamphetamine. The jury instructions were clear that the People still had the burden to prove beyond a reasonable doubt that Caso did knowingly possess or distribute an amphetamine-based controlled substance. *See* Record on Appeal, tab 72 at Instr. Nos. 1E, 1H, 7A, 7B (Jury Instrs., Mar. 5, 2019). Thus, this comment by the trial court was not prejudicial.

## B. Exhibit 12 (Recording) Was Properly Authenticated

[30]    Caso argues that Exhibit 12, the audio recording of the controlled buy, was improperly admitted. Caso asserts that the prosecution failed to properly authenticate Exhibit 12 according to the factors in *People v. Tuncap*, 2014 Guam 1, for authenticating video recordings. Appellant's Br. at 12 (citing *Tuncap*, 2014 Guam 1). Caso further argues that Officer Champion's testimony about the authenticity of the recording was "deficient" and did not satisfy the alternative means of authenticating recordings presented in *Tuncap*. *Id.* at 13-14. The People argue that satisfying the *Tuncap* factors is secondary to the trial court's consideration of specific circumstances of each recording. The People argue that Officer Champion provided sufficient testimony to authenticate the recording when he testified that he had participated in recording the controlled buy, that he had listened to the conversation in real time, that he had reviewed the recording, and confirmed at trial that the recording was a fair and accurate representation of the conversation.

[31]    In *Tuncap*, we outlined five factors which may be used to authenticate video recordings under the "silent witness" theory. 2014 Guam 1 ¶ 35. These factors include:

> testimony about (1) how the recording system operates, (2) the system's working condition and pattern of maintenance, (3) who operates the system, has access to it, and maintains its archive of recordings, (4) the quality of the recording, and (5) the means by which the recording was copied to the format viewed at trial.

*Id.* We outlined an alternative method of authenticating a recording where testimony about the

recording system is lacking:

> Where testimony about the system is lacking, testimony about the particular recording and the events it recorded may still be "sufficient to support a finding that the matter in question is what its proponent claims." To authenticate in this manner, the trial court should look to when and where the video was first viewed by the testifying witness. If the video is viewed at the scene soon after the event in question and is viewed not from a copy but directly from the system established on-site, there is little to no risk of tampering or editing the tape. To confirm this reasoning, there should also be an affirmance that the contents of the recording viewed contemporaneously with the recorded event are the same as the contents of the recording sought to be introduced into evidence. Authentication can be bolstered where the testifying witness was present at the scene of the recorded event soon after it happened and acknowledges that the recording depicts events that match with the scene observed. Such testimony would further corroborate that the surveillance video accurately depicts what occurred.

*Id.* ¶ 36 (internal citations omitted); *see also People v. Tedtaotao*, 2016 Guam 9 ¶ 14. These

principles also apply to audio recordings. *See* 2 McCormick On Evid. § 216 (8th ed. 2020) ("As

with video or film recordings of real events, if a percipient witness overheard the voices as they

were recorded, this witness may provide the required authentication foundation by testifying that

the sound recording is an accurate record of what the witness did hear. In such a case, no chain of

custody is required either, since the purpose of proving the chain is to show that the recording is

in the same condition as when first recorded."); *see, e.g.*, *United States v. Thomas*, 294 F.3d 899,

904-05 (7th Cir. 2002) (holding that an audio recording could be authenticated by testimony that

demonstrates accuracy and trustworthiness of recording; this standard was satisfied when witness

testified that he had listened to each recording, recognized the voices on the tapes, and was present

for most of the conversation, even though he was not present for some of the conversations on the

tapes); *United States v. Polk*, 56 F.3d 613, 632 (5th Cir. 1995) (holding that tape recordings of a

drug transaction were properly authenticated when an officer testified that he attached the

recording device to the confidential informant, and simultaneously listened to the recorded transaction).

[32]     Officer Champion did not testify to many of the system factors outlined in *Tuncap*. He did, however, testify that he was near the scene of the controlled buy so he could have good reception with the audio recording device, and he stated he was "monitoring" the conversation between Brewer and Caso in real time. Tr. at 21 (Jury Trial, Feb. 26, 2019). After hearing the copy of the audio recording, Exhibit 12, Officer Champion testified that it was a "fair and accurate representation" of the audio he heard during the controlled buy. *Id.* at 22. Many parts of the recording were transcribed in the trial transcript as "inaudible," and Officer Champion agreed that the recording was of "very low quality." *Id.* at 18-22, 44. Officer Champion testified that the audio quality was of the same quality as it was when created. Officer Champion testified that, despite the low quality, he recognized what was said between Brewer and Caso. *Id.* at 44-45.

[33]     The prosecution need not establish the "chain of custody" of the recordings by the five *Tuncap* factors, and Caso's challenges to Officer Champion's testimony largely turn on the low quality of the recording and that Officer Champion seemed not to recognize the actual disc containing the copy of the recording. Officer Champion's testimony satisfies the alternative means of authentication announced in *Tuncap*. Officer Champion was present at the scene of the recording, though he could not visually observe the transaction, and he could listen to the conversation as it was taking place. Further, Officer Champion testified that he recognized the voices of Caso and Brewer, though it was never established whether Officer Champion was familiar with Caso's voice before listening to the recording.

[34]     Therefore, the trial court did not err in admitting Exhibit 12 as Officer Champion provided sufficient foundation to authenticate the recording.

### C. GPD Criminalist Cayton Was Properly Admitted as an Expert in Controlled Substance Recognition

[35]     Caso argues that the trial court erred in qualifying Cayton as an expert in controlled substance recognition because the People failed to introduce evidence to qualify Cayton as an expert under GRE 702 and the trial court failed to make explicit findings that the requirements of GRE 702 were satisfied.  Caso asserts that the record is "barren of facts establishing the application and satisfaction of [GRE] 702."  Appellant's Br. at 16.  The People disagree, citing that Cayton testified to his education and his experience in conducting controlled substance recognition analysis.

[36]     Cayton testified that he was a Criminalist employed by Guam Police Department for over three years.  Cayton testified that as a criminalist, he receives "evidence from various law enforcement agencies to determine for [sic] controlled substances."  Tr. at 90 (Jury Trial, Feb. 26, 2019).  Cayton testified that he holds a bachelor's degree in Health Sciences and has conducted chemical analysis to determine whether a substance contains a controlled substance in about 181 cases.  Cayton stated that he has testified as an expert witness in the area of "controlled substance drug recognition" about six times.  *Id.* at 93.  When the People moved to have Cayton recognized as an expert in controlled substance drug recognition, defense counsel conducted a brief *voir dire*.  In response to defense counsel's question about Cayton's training with equipment used to analyze suspected narcotics, Cayton testified that he had been trained to use gas chromatography mass spectrometer and Fourier transform infrared spectrometer ("FTIR").  Cayton testified that he used both the gas chromatograph and the FTIR in an estimated 5,000 examinations.  Defense counsel did not object to the court's recognizing Cayton as an expert under GRE 702.

//

//

**[37]**     Under GRE 702, an expert may present opinion testimony.  GRE 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Guam R. Evid. 702.  This court has stated, "It is well established that under [Federal Rule of Evidence] 702, '[a]ll you need to be an expert witness is a body of specialized knowledge that can be helpful to the jury.'"  *People v. Roten*, 2012 Guam 3 ¶ 28 (second alteration in original) (quoting *United States v. Williams*, 81 F.3d 1434, 1441 (7th Cir. 1996)).

**[38]**     Caso argues that the trial court did not make specific findings that GRE 702 was satisfied.  The record does not show that the trial court made any specific findings on Cayton's qualifications as an expert.  While a trial judge is not typically required to make findings when ruling on the admissibility of evidence, the better practice is to make at least some findings setting forth the rationale used in deciding the admissibility of proffered expert evidence that is challenged.  *People v. Santos*, 2021 Guam 12 ¶ 29.  "A trial judge should strive to ensure a proper record is developed in resolving challenges to proffered expert evidence, which includes the analysis and rationale applied by the court.  Further, the trial court's analysis should reflect proper consideration of the factors required by GRE 702 . . . ."  *Id.*

**[39]**     Despite the lack of findings, Cayton was qualified to be an expert on controlled substance recognition.  In *Roten*, we found that a police officer was qualified to provide expert testimony on the prevalence of delayed reporting in sexual assault cases based on his testimony that he had 14 years of experience as a police officer, that he had investigated about 150 sexual assault cases, and that he had conducted 60 to 70 interviews with victims alleging sexual assault.  2012 Guam 3 ¶

27. We found that the police officer's level of experience with victims of sexual assault was "clearly beyond that of ordinary lay persons," and "it [was] accurate to characterize [his] testimony as testimony 'based on scientific, technical, or other specialized knowledge within the scope of Rule 702.'" *Id.* (quoting Guam R. Evid. 701(c)). Cayton's testimony about his personal experience performing the controlled substance recognition analysis and the technical nature of the analysis is clearly beyond the experience and knowledge of ordinary lay persons. Thus, the record reflects that Cayton provided sufficient testimony to establish his qualifications as an expert in controlled substance recognition despite the trial court failing to make specific findings as to Cayton's scientific, technical, or other specialized knowledge.

[40] The record reflects that Criminalist Cayton was qualified as an expert in controlled substance recognition, and the trial court did not err in failing to make specific findings as to his scientific, technical, or other specialized knowledge.

## D. Testimony of GPD Criminalist Cayton Was "Reliable" Under GRE 702

[41] Caso argues that Cayton's testimony about his identification of the substance in Exhibit 13 as methamphetamine hydrochloride was not "reliable" as required by GRE 702 because Cayton was unable to testify as to when the FTIR equipment used to identify the substance was last calibrated. Caso asserts that Cayton's expert testimony was "premised on the foundational premise that the instrumentation was properly calibrated." Appellant's Br. at 18. Caso asserts that the prosecution failed to meet its burden of establishing that Cayton's testimony was reliable. The People assert that the "calibration issue matters for the weight of the evidence, not its admissibility." Appellee's Br. at 23.

[42] "Expert 'testimony is admissible only if it is both relevant and reliable.'" *See Mateo*, 2017 Guam 22 ¶ 30 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)). "When

determining whether an expert's methodology is reliable, a court should consider factors such as 'testing, peer review, error rates, and "acceptability" in the relevant scientific community.'" *Id.* (quoting *Kumho Tire Co.*, 526 U.S. at 141).

[43]     We are presented with the novel question of the reliability of FTIR analysis.[3]  We hold that the results of the FTIR analysis were probative and reliable, and they were sufficient for Cayton to opine as to the identity of the substance in Exhibit 13.  *See United States v. Zajac*, 749 F. Supp. 2d 1299, 1302, 1306 (D. Utah 2010).  In *Zajac*, a forensic chemist with the Bureau of Alcohol, Tobacco, Firearms and Explosives, performed several tests on adhesive used to create a bomb.  *Id.* at 1301.  The chemist first performed a visual inspection of the substances, a sample from the crime scene and a sample from the defendant's home, then inspected the chemical composition of the substances for similarities using FTIR analysis and a "pyrolysis gas chromatograph mass spectrometer."  *Id.* at 1301-02.  The court found that "[t]he instruments were designed to analyze many compounds and there is no evidence before the court that [the chemist] misapplied techniques or methods when she conducted her analysis."  *Id.* at 1306.  The court concluded that the tests performed were both probative and reliable, as they were well-accepted in the scientific community.  *Id.*  Similarly, Cayton testified that he had performed a stereoscopic examination on the sample and then a "color test," which resulted in a presumptive positive result.  Tr. at 97 (Jury Trial, Feb. 26, 2019).  Cayton testified that he conducted the FTIR analysis and testified to the steps he took in conducting the analysis and how FTIR analysis worked.  Cayton testified that the FTIR required calibration usually conducted by an off-island expert, and that he was unaware if

---

[3] This court has considered the reliability of field tests which produce "presumptive" results, rather than the results of "confirmatory tests" like FTIR analysis.  In *People v. Mateo*, 2017 Guam 22, we acknowledged that field tests, which are presumptive tests, for controlled substances can be found reliable under the *Daubert* standard under some circumstances.  2017 Guam 22 ¶ 33.  We noted that "[t]he mere fact that [an expert] could not perform a confirmatory test does not invalidate the [presumptive] test or inhibit its admissibility but rather reflects on the weight of her testimony."  *Id.* ¶ 32 (alterations in original) (quoting *Sciaraffa v. State*, 28 N.E.3d 351, 358 (Ind. Ct. App. 2015)).

the FTIR had been calibrated in the three years that he was employed. However, this court has not required that the expert lay the foundation as to the calibration and functionality of the FTIR before testifying on the results of the FTIR analysis. Nor has Caso cited case law which supports a finding that results from an FTIR without proof of calibration are unreliable, a factor we considered in evaluating the reliability of field tests in *Mateo*. *See* 2017 Guam 22 ¶ 32. Therefore, we find Cayton's testimony sufficient to establish the reliability of the FTIR test results because Cayton, a qualified expert in the use of such machine, testified that he initiated the self-analysis function in which the FTIR machine analyzes itself to determine whether it is within set parameters for analysis, and that it was the practice of the Crime Lab not to perform analysis if the FTIR did not meet these parameters.

[44]     The trial court did not err in admitting Cayton's expert testimony about the results of the FTIR analysis.

**E.  Certain Testimony by Witnesses Were Inadmissible Hearsay**

[45]     Caso argues that Officers Champion, Igros, and Terlaje each gave inadmissible hearsay testimony.

[46]     "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Guam R. Evid. 801(c); *see also Tedtaotao*, 2016 Guam 9 ¶ 19. "A hearsay statement is not admissible as evidence 'unless it falls into a known exception.'" *Tedtaotao*, 2016 Guam 9 ¶ 19 (quoting *J.J. Moving Servs., Inc. v. Sanko Bussan (Guam) Co.*, 1998 Guam 19 ¶ 32); *see also* Guam R. Evid. 802.

   **1.  Officer Champion**

[47]     Caso alleges three instances where Officer Champion provided hearsay testimony.

### a. Officer Champion's statement relating to Caso as Brewer's source

[48]    First, Caso claims that Officer Champion gave hearsay testimony identifying Caso as Brewer's source of the methamphetamine. Officer Champion testified that Brewer "identified Mr. Caso as her source" of a substantial amount of methamphetamine. Tr. at 7 (Jury Trial, Feb. 26, 2019). The People claim this statement was not hearsay as the purpose of the statement was "to help the jury understand Officer Champion's thinking when preparing the plan of investigation and controlled buy for the future operation against Caso." Appellee's Br. at 24. The People argue that this case presents a situation like that in *People v. Camaddu*, 2015 Guam 2, where a nurse provided non-hearsay testimony on what a sexual assault victim told her because that conversation led the nurse to conduct an examination. *Id.* (citing *Camaddu*, 2015 Guam 2 ¶ 68). The People argue this statement by Officer Champion was submitted to show why he conducted an operation against Caso. The People also claim that the statement is non-hearsay under GRE 801(d)(1)(C), which defines a statement of identification of a person made after perceiving the person as non-hearsay.

[49]    When a statement is offered for its effect on the listener, rather than offered for its truth, that statement is non-hearsay. *See United States v. Torres*, 794 F.3d 1053, 1059 (9th Cir. 2015) ("The Advisory Committee Note clarifies that the effect of the 'statement' definition is to 'exclude from the operation of the hearsay rule all evidence of conduct, verbal or nonverbal, not *intended* as an assertion. The key to the definition [of a statement] is that nothing is an assertion unless intended to be one.'" (alteration in original) (citing Fed. R. Evid. 801 advisory committee's note to Subdivision (a) of the 1972 Proposed Rules)). In *Camaddu*, we held that a nurse's testimony about a victim's claim of penetration was offered to explain why the nurse conducted an examination of the victim, rather than to prove that penetration had occurred. 2015 Guam 2 ¶ 68.

In contrast, we found in *Tedtaotao* that a police officer's testimony about statements made to him by the victim of a robbery were not being presented for "the limited purpose of providing background or explaining the course of [the officer's] investigation." 2016 Guam 9 ¶ 21.[4]

[50]     Here, it is clear that the statement was being offered as part of the explanation as to why the police officers undertook their investigation rather than to prove that Caso was Brewer's source. The prosecution posed the question: "And how did the defendant come to your attention on September 25, 2018?" Tr. at 6 (Jury Trial, Feb. 6, 2019). Officer Champion responded, "He came to our attention through a source of information." *Id.* at 6-7. The prosecutor then asked, "And what about the source of information led to Mr. Caso?" *Id.* at 7. Officer Champion replied that "[Brewer] was found to be in possession of -- what I consider to be a substantial amount of methamphetamine; basically, she identified Mr. Caso as her source." *Id.* In context, Officer Champion's testimony was describing how Caso became the target of the investigation. As there was no objection to Officer Champion's testimony, the prosecutor did not clarify specifically whether it was offered for the truth or for background information. However, the context surrounding the line of questioning demonstrates that the statement was elicited to explain the background of events that led to the controlled buy. Thus, this statement was non-hearsay as it was introduced for the effect on the listener.

### b. Officer Champion's statement relating to the relationship between Caso and Brewer

[51]     Second, Caso claims that Officer Champion provided inadmissible hearsay about the relationship between Caso and Brewer. Specifically, Officer Champion testified that "[Brewer]

---

[4] In *People v. Tedtaotao*, 2016 Guam 9, we acknowledged that, in some cases, "law enforcement testimony regarding a declarant's out-of-court statement is not hearsay if used for the purpose of explaining why a government investigation was undertaken or as background to explain an officer's state of mind and actions." 2016 Guam 9 ¶ 20 (citing cases).

also expressed some regret at wanting to execute a controlled buy against Mr. Caso as, I guess . . . they were rather -- rather close." Tr. at 8 (Jury Trial, Feb. 26, 2019). Because Caso did not object to Officer Champion's testimony, we again apply the plain error test.

[52]     While Officer Champion is repeating the declaration made by Brewer, it is unclear for what purpose the prosecution sought to admit the statement. The transcripts show that the prosecutor asked Officer Champion how "eager" Brewer was to participate in the controlled buy. *Id.* at 7-8. But it is unclear how such a statement, even if offered to prove that Brewer was eager to participate in the controlled buy, would prejudice Caso. While the admission of the statement does seem to be in error, Caso has not attempted to show how this statement was prejudicial beyond adding to alleged cumulative effect of evidentiary errors by the trial court.

[53]     The trial court erred in admitting this statement as it was hearsay not within any exception. But Caso failed to argue how the admission of this statement was prejudicial error, and it is not apparent how Caso was prejudiced by its admission. We conclude that Caso's substantial rights have not been affected as there appears to be no prejudice resulting from the admission of Officer Champion's statement about the relationship between Caso and Brewer. Thus, we find no plain error.

### c. Officer Champion's statement identifying Exhibit 13

[54]     Third, Caso argues that Officer Champion provided hearsay testimony identifying Exhibit 13. Caso challenges two statements. Officer Champion testified, "[Brewer] relinquished custody, I believe, it was 1.2 grams of suspected methamphetamine." Tr. at 15 (Jury Trial, Feb. 26, 2019). Officer Champion also testified, "The suspected methamphetamine was field tested and presumptive positive reading for methamphetamines was obtained." *Id.* As above in Part IV.A.1, Caso argues that Officer Champion had no personal knowledge of the field testing of Exhibit 13,

and thus his statements were "based upon inadmissible hearsay in violation of Rule 802." *See* Appellant's Br. at 20-21, 23-24. The People counter that Officer Champion's knowledge of the drugs in Exhibit 13 was not solely based on hearsay. The People assert that Officer Champion testified that he observed the item taken from Brewer on the day of the controlled buy and identified that in court. The People also assert that Officer Champion testified to the characteristics of methamphetamine based on his experience as a police officer. The People conclude the testimony was based on Officer Champion's personal knowledge, which is allowable under GRE 602.

[55] "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. . . . This rule is subject to the provisions of rule 703, relating to opinion testimony by expert witnesses." Guam R. Evid. 602. "Personal knowledge means knowledge produced by the direct involvement of the senses." *United States v. Lopez*, 762 F.3d 852, 863 (9th Cir. 2014) (citing 3 Mueller & Kirkpatrick, *Federal Evidence* § 6.6 (3d ed. 2012)). In *United States v. Lopez*, a border agent testified to the defendant's deportation at the border of the United States and Mexico, an element of the offense the government had to prove beyond a reasonable doubt. *Id.* at 856-57. The border agent testified on the process normally conducted on deportation, but the agent was not physically present for the defendant's removal at the border. *Id.* at 857. The court found that the border agent could not have testified based on his personal knowledge as required by Federal Rule of Evidence 602. *Id.* at 863. The border agent was also not qualified as an expert under Federal Rule of Evidence 702 and could not provide expert testimony on how removals normally occur. *Id.* at 857. Ultimately, the court determined that error was harmless because of the introduction of a properly

authenticated verification form which the court found "legally sufficient to support a finding of physical removal beyond a reasonable doubt." *Id.* at 865, 867.

[56]     Here, as in *Lopez*, the record does not reflect that Officer Champion had personal knowledge of the results of the field test. Despite the People's contention that Officer Champion stated he observed the substance in Exhibit 13 on the day of the controlled buy, the record does not reflect when or where that may have occurred. Officer Champion testified that he did not follow Brewer to the pre-arranged spot after the controlled buy. Officer Champion stated that Brewer was followed by Officers Igros and Terlaje, and that he was unsure who performed the field test. Officer Terlaje testified that only two officers, neither of whom was Officer Champion, were present at the pre-arranged location to meet Brewer after the controlled buy. Nor is there any testimony that Officer Terlaje interacted with Officer Champion after performing the field test and submitting the evidence to the GPD Crime Lab. Further, Officer Terlaje authenticated the evidence forms and provided the testimony which established the chain of custody for Exhibit 13 at trial. It is unclear on what basis Officer Champion could claim personal knowledge of the field testing. Thus, we conclude that Officer Champion lacked the personal knowledge to testify about the field testing.

[57]     As Caso did not object to Officer Champion's testimony at the time of trial, the admission of these hearsay statements is reviewed for plain error. *See Lopez*, 762 F.3d at 859. The error was clear, but Caso's substantial rights were unaffected. As in *Lopez*, the testimony provided by Officer Champion about the results of the field testing and the chain of custody of Exhibit 13 were properly authenticated by another means. Officer Terlaje testified about both the field testing of the substance received from Brewer, the results of her field test on the substance, and the submission of that substance into evidence with the GPD Crime Lab. Therefore, Caso was not

prejudiced by the trial court's error as the substance of Officer Champion's hearsay statements was also introduced by a witness with personal knowledge.

[58]     Though several of Officer Champion's statements were hearsay, Caso's substantial rights were not affected as other evidence was properly admitted which established the claims made by Officer Champion.

### 2. Officer Igros

[59]     Caso asserts that Officer Igros provided hearsay testimony that Caso was Brewer's source of the methamphetamine.  Officer Igros testified that he "asked [Brewer] where she got the dope that was found on her.  She stated she got it from Mr. Caso."  Tr. at 60 (Jury Trial, Feb. 26, 2019).

[60]     This statement by Officer Igros is non-hearsay, as it was providing background information on why Caso was targeted for the controlled buy rather than being introduced for its truth.  Officer Igros testified that Brewer was summoned to the *Mandaña* Task Force office after she was found with "dope" earlier in the day.  *Id.* at 59.  When asked by the prosecutor what happened after Brewer arrived at the office, Officer Igros testified that Brewer was debriefed, and she revealed Caso as her source.  The prosecutor then asked Officer Igros questions about the "setting up of the controlled buy."  *Id.*  It is apparent from the record that Officer Igros's statement was not intended to prove that Caso was the source of the methamphetamine sold to Brewer during the controlled buy, but that Caso was the source of the methamphetamine found on Brewer in the incident earlier in the day which led to her cooperation in the controlled buy.  Like in *Mateo*, Officer Igros testified to Brewer's statement to provide context for initiating the controlled buy.

[61]     The trial court did not commit error in admitting Officer Igros's statement.  The statement was non-hearsay, introduced for the effect it had on the listener.

### 3. Officer Terlaje

[62]     Caso asserts that Officer Terlaje provided hearsay testimony that Brewer handed her methamphetamine after the controlled buy.  Specifically, Caso argues that Officer Terlaje testified that Exhibit 13 contained methamphetamine even though she did not perform the laboratory test.  Presumably, Caso is arguing that without personal knowledge of the laboratory test, Officer Terlaje lacked the personal knowledge to state that Exhibit 13 was methamphetamine.  The People's arguments are non-responsive to Caso's arguments that Officer Terlaje's testimony identifying the substance Brewer gave her as methamphetamine was hearsay.[5]

[63]     Caso does not identify a particular statement by Officer Terlaje relating to her testimony that Exhibit 13 contained methamphetamine.[6]  Officer Terlaje testified that after Brewer, referred to as "she" or "SOI" (source of information), handed her the baggie, Officer Terlaje transported the evidence to the *Mandaña* Task Force office, where she conducted a field test kit for methamphetamines.  Tr. at 81-83 (Jury Trial, Feb. 26, 2019).  Officer Terlaje testified that the field test produced a presumptive positive for methamphetamines.  This is all the testimony that Officer Terlaje gave as to the identity of the substance in Exhibit 13.  Officer Terlaje did not testify about the results of the laboratory test conducted later by Cayton, but the results of the field test she conducted.  Officer Terlaje had the personal knowledge to testify as to the results of the field test

---

[5] The People address the statement as "the statement that Caso gave Brewer methamphetamine during the controlled buy . . . ." Appellee's Br. at 26.  Caso only argues that "[a]lthough [Officer Terlaje] did not conduct the laboratory test of Exhibit 13, Officer Terlaje gave the hearsay testimony that it was methamphetamine." Appellant's Br. at 22.  Caso challenges no other testimony by Officer Terlaje as hearsay.

[6] Caso cites only to Officer Terlaje's testimony that "[s]he handed me a baggie, which contained crystalline substance." Tr. at 80 (Jury Trial, Feb 26, 2019).  Caso claims that Officer Terlaje never identified Brewer in court and thus never connected her with Exhibit 13.  It is unclear how Caso intends this line of reasoning to allege hearsay.  The record does not reflect that Brewer informed Officer Terlaje of what the baggie contained, nor did Officer Terlaje testify that the act of Brewer handing her the baggie was understood as a statement that the substance contained within the baggie was methamphetamine.  Therefore, Caso must be challenging Officer Terlaje's statement on the results of the field test which registered a presumptive positive for methamphetamine.

she personally conducted. Officer Terlaje conducted the field testing, observed the results of the test, and testified in court as to the results. Therefore, Officer Terlaje's statement was non-hearsay.

## V.  CONCLUSION

**[64]**     The trial court made certain errors during Caso's trial, such as the erroneous admission of Exhibit 13 based on Officer Champion's testimony and the erroneous admission of Officer Champion's hearsay testimony relating to the results of the field testing conducted by Officer Terlaje. Ultimately, these errors were not prejudicial to Caso's substantial rights, as each error was remedied by testimony provided by other witnesses during the trial. We **AFFIRM** the judgment of conviction.


/s/                                                                              /s/
ROBERT J. TORRES                                        KATHERINE A. MARAMAN
Associate Justice                                                    Associate Justice



/s/
F. PHILIP CARBULLIDO
Chief Justice